# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **RENEE RITCHEY,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.:  2:07-CV-1844-RDP** |
| | } | |
| **SOUTHERN NUCLEAR** | } | |
| **OPERATING COMPANY, INC.;** | } | |
| **DUANE BROCK,** | } | |
| | } | |
| **Defendants.** | } | |

## MEMORANDUM OPINION

This case is before the court on the Motion for Summary Judgment (Doc. # 38) filed by Defendants Southern Nuclear Operating Company, Inc. ("Defendant" or "Southern Nuclear") and Duane Brock.  The motion has now been fully briefed and is ripe for decision.  (*See* Docs. # 39, 47, 54).  For the reasons discussed below, the court finds that Defendants' motion is due to be granted.

Plaintiff's Complaint asserts violations of:  (a) Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000e, *et seq.*; (b) the Equal Pay Act ("EPA"), 29 U.S.C. Section 206(d); (c) the Age Discrimination in Employment Act of 1967 (ADEA), 29 U.S.C. § 621, *et seq.*; and (d) [sic] the laws of the State of Alabama.  (Doc. # 1 at 1).  In total, the Complaint asserts seven claims against Defendants: Count One - Title VII Gender Discrimination; Count Two - Equal Pay Act; Count Three - Age Discrimination; Count Four - Retaliation; Count Five - Hostile Work Environment; Count Six - Negligent Hiring, Training, Supervision and Retention; and Count Seven - Intentional Infliction of Emotional Distress.  (Doc. # 1).[1]

---

[1] In her Opposition to Defendants' Motion for Summary Judgment, Plaintiff seeks to add a number of claims not stated in her Complaint.  (*See* Doc. # 47 at p. 17).  She agues that, although

After a close review of the record and the arguments made in this case, the court concludes that it is entirely possible that Plaintiff was treated unfairly, or even that she was poorly managed by her supervisors. However, and despite Plaintiff's litany of complaints, the record evidence does not establish that any of the conduct about which Plaintiff complains was directed toward her because of her gender, her age, her protected conduct, or for any other illegal reason. The distinction between fairness and legality is important because the anti-discrimination laws at issue do "not require that the employer's decision be rational or that an employer hire or promote the most qualified applicant, nor does it even guarantee success for those having greater merit. Title VII only requires that the employer make such decisions without regard to race, sex, religion, color, or national origin [or protected conduct]." *Smith v. Alabama Dept. of Public Safety*, 64 F.Supp. 2d 1215, 1228 (M.D. Ala. 1999) (quoting *Harris v. Delchamps, Inc.*, 5 F.Supp. 2d 1316, 1321 (M.D. Ala. 1998) (citing *Gilchrist v. Bolger*, 733 F.2d 1551, 1553 (11th Cir. 1984))). "Employers have the freedom to make unwise, unsound, or even irrational decisions, and courts do not sit as super-personnel boards." *Tarrance v. Montgomery County Bd. of Educ.*, 157 F.Supp. 2d 1261, 1263 (M.D. Ala. 2001) (citing *Smith*, 64 F.Supp. 2d at 1228 and *Harris*, 5 F.Supp. 2d at 1321). This court's role is to carefully apply the relevant law to the undisputed facts of the case, not to arbitrate grievances about conduct

_____

these claims were not specifically set forth in the very-specifically-named headings of her Complaint, they were "embodied" within the Complaint. However, the "liberal pleading standard for civil complaints under Federal Rule of Civil Procedure 8(a) ... does not afford plaintiffs with an opportunity to raise new claims at the summary judgment stage." *Gilmour v. Gates, McDonald and Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004). "At the summary judgment stage, the proper procedure for plaintiffs to assert a new claim is to amend the complaint in accordance with Fed.R.Civ.P. 15(a). A plaintiff may not amend her complaint through argument in a brief opposing summary judgment." *Gilmour*, 382 F.3d at 1315 (citing *Shanahan v. City of Chicago*, 82 F.3d 776, 781 (7th Cir. 1996)). The claims before the court in this case are those set forth by Plaintiff in her Complaint.

that does not violate the law.  For these reasons, and those set forth in more detail below, Plaintiff's

claims in this case fail, and Defendants are entitled to judgment in their favor.

## I.     Facts[2]

Defendant Southern Nuclear is a wholly owned subsidiary of the Southern Company.  (Doc.

# 40, Ex. U at ¶ 1; Doc. # 46-1 at ¶ 2).[3]  It operates three nuclear power plants in Georgia and

Alabama.  (Ex. U).  Plaintiff, Renee Ritchey, who is female and age 52, began her employment with

Defendant in December 2002.  (Ex. U at ¶ 3; Doc. # 46-1 at ¶ 2).  It was at that time that the decision

was made to transfer those Southern Company engineers who supported nuclear plants to Southern

---

[2]  If facts are in dispute, they are stated in the manner most favorable to the non-movant.
*Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993).  The analysis of the issues related
to this motion has been made more challenging than usual owing to several factors, including but
not limited to: (a) the voluminous record submissions by Defendants in this single plaintiff discharge
case; and (b) Plaintiff's Opposition, which cites in many instances to documents by exhibit or bates
number rather then to the Rule 56 record.  The court must further note that it has been somewhat
frustrated by the manner in which Plaintiff has presented her facts and factual disputes in her
preparation of the statement of facts in this case.  Appendix II to the Scheduling Order (Doc. # 12)
provides that, in supporting and responding to summary judgment, "Counsel must state facts in clear,
unambiguous, simple, declarative sentences."  (Doc. # 12, Appx. II(D)).  Appendix II further
provides, "Any statements of fact that are disputed by the non-moving party must be followed by a
specific reference to those portions of the evidentiary record upon which the dispute is based. *All
material facts set forth in the statement required of the moving party will be deemed to be admitted
for summary judgment purposes unless controverted by the response of the party opposing summary
judgment*."  The court's examination of the record cites listed in support of Plaintiff's denial of many
of Defendants' stated facts revealed evidence that did not, in fact, contradict the facts as presented
by Defendants. The court also notes that the recitation of facts without placing them in time context
is a particularly unhelpful practice.

[3] Unless otherwise indicated, the evidence cites are to the exhibits to Defendant's Evidentiary
Submission (Doc. # 40), which includes Plaintiff's exhibits.  Those exhibits to Document 40 which
are filed under seal can be found under the same exhibit number or letter attached to Document 42.

Nuclear.  (Ex. Z at ¶¶ 3-5).  Plaintiff had worked since September 1977[4] for Southern Company (Doc. # 46-1 at ¶ 2).  She became employed by Southern Nuclear in December 2002 as a Senior Engineer.  (Ex. A at 56, Ex. U at ¶ 3; Doc. # 46-1 at ¶ 4).  During the relevant time period, Plaintiff's supervisor was Duane Brock.[5]  (Ex. A at 71; Doc. # 46-1 at ¶ 2). Plaintiff was the only female employee under Brock's supervision at Southern Nuclear.  (Ex. F at 27-28).

### A.    Defendants' Policies

Southern Nuclear has two comprehensive and widely disseminated policies that prohibit discrimination and harassment in the workplace and encourage employees to bring forward any complaints they may have: the Equal Employment Opportunity Policy, and the Workplace Free of Harassment Policy.  (Exs. B-3, B-4, and LL at ¶ 3).  These policies prohibit, among other things, discrimination on the basis of gender and age.  (Exs. B-3, B-4).  Southern Nuclear employees are required to complete yearly compliance questionnaires in which they may disclose any violations of the company's anti-discrimination and anti-harassment policies.  (Ex. O at ¶ 2).

In addition, Southern Nuclear is required by the Nuclear Regulatory Commission ("NRC") to maintain a fitness-for-duty ("FFD") program for all employees who have unescorted access to certain parts of the nuclear power plants.  (Ex. G at 9-11, 15-16, 78-79, 81-82, 87-88, 89-91).  The FFD program includes, among other things, drug and alcohol testing, behavioral observation of

---

[4] Plaintiff started with Southern Company as a co-op electrical engineer and was the first female engineer hired at Southern Company.  (Doc. # 46-1 at ¶ 2).  She eventually became a Senior Engineer in 1998 (Doc. #46-1 at ¶ 2), a promotion decision that was approved by Dave Brock before Plaintiff began working at Southern Nuclear. (Ex. J-4, J-7).

[5] Brock is approximately two years older than Plaintiff.  (Ex. C at 8).

employees, and mandatory FFD evaluations.  (*Id*.).  All employees subject to the FFD program receive annual compliance training on the policy.  (Ex. G at 10-11, J-99 – J-103).

Pay increases at Southern Nuclear are determined by a number of factors, including current salary, salary compared to the appropriate pay grade, and performance rating.  (Ex. U at ¶ 9; Ex. LL at ¶¶ 12-13, 18).  Employees receiving higher performance ratings generally receive greater pay increases, although two employees with the same performance rating may receive different increases depending on their relative position within the pay grade.  (Ex. U at ¶ 9; Ex. LL at ¶ 12). Individual supervisors make pay recommendations based upon factors such as employee performance and position within the pay grade. (Ex. U at ¶ 9; Ex. LL at ¶¶ 12-13).  Southern Nuclear also has an incentive pay program, Pay for Performance Plan ("PPP").  (Ex. LL at ¶ 14).  This program provides incentive pay to employees performing at or above expectations.  (*Id*.).

B.     **Plaintiff's Employment History**

1.     **Plaintiff's Transfer to Southern Nuclear**

Prior to beginning work with Southern Nuclear, Plaintiff's last supervisor at Southern Company was Larry McWhorter.  (Ex. HH at ¶ 2).  The last performance evaluation Plaintiff received from McWhorter rated her as meeting expectations, but also identified areas for improvement, such as technical skills, leadership ability, and avoiding distractions.  (Ex. HH at ¶ 4 and Ex. 9 thereto).  McWhorter considered Plaintiff one of the lowest performers in his group.  (Ex. HH at ¶ 3). However, because McWhorter continually perceived Plaintiff's performance to be on the borderline of "acceptable," he never gave her an "unacceptable" rating, a rating which would disqualify an employee from receiving a merit increase and a bonus.  (Ex. HH at ¶ 4).  Nevertheless,

in McWhorter's opinion, Plaintiff required more supervision, and her productivity was lower, than her peers, and she was in the lowest-ranked ten per cent of his direct reports.  (Ex. HH at ¶¶ 3, 4).

At the time Plaintiff and the other Southern Company engineers were transferred, with limited exceptions not relevant here, Southern Nuclear retained their Southern Company pay.  (Ex. LL at ¶ 18).  Prior to her transfer to Southern Nuclear, Plaintiff's pay had been set for the year 2002 based upon Southern Company's policies.  (*Id.*).  Based upon her pay at Southern Company, Plaintiff's pay was the lowest for the Senior Engineers who came under Duane Brock's supervision. (Ex. LL at ¶ 19).

Although Plaintiff's duties were similar under McWhorter at Southern Company and under Brock at Southern Nuclear, after the transfer to Southern Nuclear, the engineers enjoyed more direct coordination with the nuclear plants.  (Ex. Z at ¶ 3, 7).  Southern Nuclear's expectation of the engineers was that they would have to exercise more independent judgment than had previously been required while at Southern Company.  (Ex. Z at ¶ 7).

During the process of determining which Southern Company engineers would transfer to Southern Nuclear, there was some verbal concern expressed about Plaintiff's performance and where she might fit.  (*See e.g.*, Ex. Z at ¶ 6, 7).  In light of these expressed concerns, David Jones, the Engineering Plant Support Manager, personally reviewed Plaintiff's personnel file.  (Ex. Z at ¶ 7). Jones did not believe that the concerns being expressed verbally had been sufficiently documented in Plaintiff's personnel file to preclude her transfer to Southern Nuclear.  (Ex. Z at ¶ 8).  Therefore, Jones took Plaintiff into his group and assigned her to Plant Hatch[6] under Brock's supervision, a

---

[6] Hatch is a nuclear facility located in Baxley, Georgia.  (Doc. # 46-1 at ¶ 2).

location where she had experience and under the supervision of a manager who had previously supervised her.  (Ex. Z).

### 2.    Plaintiff's Performance at Southern Nuclear

Plaintiff's 2003 performance evaluation was prepared by Brock and contained no derogatory comments.  (Ex. M at ¶ 14; Ex. A at pp. 141-42; Ex. B - 21).  However, similar to the last appraisal she received from McWhorter at Southern Company, it made references to Plaintiff's "adequate" performance; it also included suggestions for improvement.  (Ex. M at ¶ 14; Ex. B -21).  In March 2004, Brock's first quarter performance evaluation indicated that Plaintiff was not meeting expectations. (Ex. B-29).  Brock indicated four areas for improvement: communication skills, verbal and written; technical capabilities; dependability; and professional image.[7]  (Id.)  Jones also received feedback from managers under his supervision that Plaintiff's performance was minimally acceptable and that she was struggling in her position to meet deadlines and work independently.[8]  (Ex. Z at ¶ 9).  In addition, his own interaction with Plaintiff led Jones to conclude that her performance needed to be managed.  (Ex. Z at ¶ 10-12).  Jones therefore directed Brock to place Plaintiff on a Performance Improvement Plan ("PIP")[9] (Ex. C at p. 110; Ex. M at ¶ 16; Ex. Z at ¶ 12), and in May

---

[7] The various affidavits and declarations filed in support of and in opposition to summary judgment reveal that many, although not all, of Plaintiff's co-workers shared this low opinion of Plaintiff's performance and/or skills. (Exs. K-SS; Doc. # 46, Exs. 2-5).

[8] Although Plaintiff believes that other females who worked at Defendant Southern Nuclear had concerns with Brock (see Doc. # 46-1 at ¶ 5), when Dawkins interviewed female engineers who directly reported to him – Dana Putman Claburn, Jacqueline Graham, and Cheryl Johnson – they reported they all had favorable working experiences with him and hold him in high regard.  (Ex. U at ¶ 5 and Ex. 1 thereto).

[9] No employee under Brock's supervision, other than Plaintiff, was placed on a PIP; the other employees under Brock were rated as meeting or exceeding expectations for the years 2004 and 2005.  (Ex. A at p. 359:2-16, Ex. C at p. 109:3-6; Ex. U at ¶ 10).

2004, Plaintiff was placed on a PIP.  (Ex. Z at ¶ 12; Ex. M at ¶ 16).  PIPs are designed to help under-performing employees improve their performance; they are not punitive in nature.  (Ex. U at ¶ 11).

After Plaintiff was placed on the PIP, the record reveals that Brock may not have always been effective in assisting her in efforts at improvement.  He did, however, make some efforts.  For example, Brock attempted to provide Plaintiff with not only feedback regarding her performance, but also tools designed to help her succeed.  (Ex. M at ¶¶ 16, 17).  He spoke with Cindy Nelson, who was then an HR Business representative, about identifying training opportunities for Plaintiff. Nelson and Brock decided it would be beneficial for Plaintiff to complete a personality assessment, something Brock himself had completed in the past and found helpful.  (Ex. M at ¶ 16, Ex. LL at ¶ 5).  Nelson recommended the DISC Profile which Plaintiff completed.  (*Id.*).

But while Brock endeavored to provide Plaintiff with feedback, he may not have always been effective in doing so.  Sharon T. Dawkins, a Labor Relations Coordinator with Defendant (Ex. U at ¶ 1), was called upon to investigate Plaintiff's complaints about Brock.  (Ex. U at ¶ 5).  As Plaintiff notes in her opposition brief, Dawkins was concerned that Brock was not being completely effective in dealing with Plaintiff and her opinion was Plaintiff did not have a confident feeling that Brock would make a sincere effort to help Plaintiff overcome her performance issues.  (Doc. # 47 at p. 6, n.5; Ex. U at ¶ 2).  Notwithstanding these concerns, Brock acknowledged that Plaintiff improved in some areas while on the PIP, but also stated that she continued to have problems in certain areas. (Doc. # J-18 at pp. 254-62).  Although Plaintiff made some improvement, her performance did not progress to a level where it met Brock's expectations.  (Ex. A at 188-89, 233-34, 243-44, Ex. J-16, Ex. J-18).

In February 2005, in the Corporate Compliance Survey completed by Plaintiff, she answered "yes" to the following question:

> In 2004, were you subjected to intimidation, harassment, or discrimination in the workplace based on race, sex, age, color, religion, national origin, sexual orientation, veteran's status or disability?  (If yes, please explain.  It is not necessary to identify incidents that have already been reported and satisfactorily resolved.)

(Ex. J-62 at 1550-55).  She made the following comment regarding her answer: "I would like to reserve this issue and discuss possibly at a later time, but not now."  (*Id.*)

In approximately February 2005, Bill Burmeister assumed the position of Manager, Plant Support.  (Ex. P at ¶ 2).  In that position, Burmeister indirectly supervised Plaintiff.  (*Id.*).  After assuming his new position, Burmeister met with his direct reports, Brock and Ken McElroy, to discuss employees with performance or conduct issues.  (*Id.* at ¶ 3).  Burmeister reviewed the two PIPs that were in place – those for Plaintiff and Mr. Ravi Grover.  (*Id.*).  He made several suggestions about how to improve the effectiveness of PIPs.  (*Id.*).  Specifically as to Plaintiff, Burmeister suggested adding a deadline of October 31, 2005 by which she should be able to bring her performance up to the expected level.  (Ex. P at ¶ 4).  Thus, it was Burmeister, not Brock, who added the deadline for improved performance.

On or about April 22, 2005, Plaintiff met with Brock about changes to her PIP and was informed of the October 31, 2005 deadline to bring her performance up to expectations or face discharge.  (*Compare* Doc. # 41 at ¶ 37 *with* Doc. # 45 at ¶ 37).  In this meeting, Plaintiff complained to Brock that she found their meetings about her performance to be stressful and that they caused her health problems.[10]  (Ex. J-18 at pp. 273-76).  She asked to be able to review the revised PIP, which

---

[10] For example, during some (if not most) of the PIP meetings with Brock, Plaintiff would cry.  (Ex. C at pp. 266-70).

included the October 31 deadline, before signing it. (*Id.*).  On or about April 29, 2005, Plaintiff e-mailed Brock stating that she was writing a rebuttal to the revised PIP, which included the October 31, 2005 deadline, and that she refused to sign it.  (Ex. M-34 at p. 10505).

On May 2, 2005, Plaintiff submitted a Concern Form to Bryant.  (Ex. J-62).  Plaintiff stated that she felt that she was "being singled out and treated unfairly by [her] supervisor." (*Id.*).  Bryant followed up with Plaintiff about filing a formal concern with more detail about her complaints, but she declined to do so.  (Ex. J-59, Ex. J-64 at p.1495).  However, on May 3, 2005, Plaintiff told Bryant that she felt she was being singled out because she was the only female in her group.  (Ex. J-59).  Despite follow up from Bryant in June and early August 2005, it was not until August 9, 2005 that Plaintiff approached Brock's supervisor, McElroy, about her complaints that Brock was treating her unfairly.  (*E.g.*, Ex. F at pp. 63-70).

Plaintiff did not receive the response to her complaints that she desired from McElroy, who apparently shared Brock's opinion regarding Plaintiff's performance issues.  (*Id.*).  Therefore, on August 19, 2005, Plaintiff filed a formal concern with Southern Nuclear's Corporate Concerns Program alleging that she was being singled out and treated unfairly by Brock, that Brock acted inappropriately and made her feel uncomfortable, and that he had threatened her job and her pay.  (Ex. B-49 at p. 1266).  In addition, Plaintiff complained that Brock made what she perceived as gender-biased and harassing comments, including the following:  "You are not cut out to be an engineer; I think you'd make a natural teacher;" "You should look for another line of work;" "you remind me of my wife and I don't like her attitude either;" "What do you have to show for twenty-eight years with the company;" "I don't think we can turn this around;" "It doesn't matter, this won't change;" "The good news is we both get to keep our jobs.  The bad news is you are still not

10

performing up to expectations;" "if I were you, I'd apply for another job;" and "Defending you is lowering my credibility with management." (Ex. B-49; Ex. J-16).  Plaintiff also complained that Brock excluded Plaintiff from unofficial group activities such as lunch and social conversation.  (*Id*. at p. 1267-68).

Plaintiff had other complaints about Brock – she claimed that Brock was impatient with her, slammed drawers, yelled, made degrading remarks in e-mails, displayed a negative body language to her, intimidated her, threatened her job, and told her he was not afraid to do what he felt was necessary.  (*Id*. at p. 1266).  Plaintiff also related a story that Brock told her about a coach who, after a father had complained to him that his child was not getting enough playing time, punished the child by not playing him.[11]   (*Id*. at p. 1268).

Upon receipt of Plaintiff's formal complaint, Bryant began an investigation of Plaintiff's allegations.  (Ex. O at ¶ 4).  Plaintiff provided several lists of employees whom she wanted Bryant to interview.  (Ex. D. at 65-68).  However, Bryant interviewed mostly those employees who were involved in the day-to-day management of Plaintiff's performance and who could help him "assess the effectiveness of management of [Plaintiff's] performance under the PIP and whether her performance was fairly managed."[12]  (Ex. O at ¶ 5; J-64).  At least two employees were interviewed at Plaintiff's request.  (Ex. D at p. 75).  Further, Bryant submitted information requests to Plaintiff and Brock, interviewed numerous witnesses, and reviewed numerous documents.  (Ex. O at ¶ 5).  Also during his investigation, Bryant had several opportunities to speak with Plaintiff in person and

---

[11] Plaintiff further claims that, on one occasion, Brock deleted an e-mail from Plaintiff's computer which he had sent.  (*Id*. at p. 1266-67).

[12] Plaintiff took this to mean that Bryant "did not take my complaint of discrimination seriously."  (Doc. # 46-1 at ¶ 12).

11

by phone. (Ex. O at ¶ 5). Based on his numerous interactions with Plaintiff during the investigation, Bryant observed that, consistent with her management's assessment, she suffered from shortcomings in both her written and verbal communication skills. (Ex. O at ¶ 5). Bryant indicated that Plaintiff often did not respond to the questions that she was asked, had a tendency to ramble during their conversations, and would jump from subject to subject. (*Id*.). These problems made it difficult for Bryant to understand her point of view. (*Id*.).

Bryant's investigation concluded that, although Plaintiff's performance was lacking, despite Brock's genuine efforts, her performance had not been managed in an effective manner by him.[13] (*Id*. at ¶ 6). As Bryant stated in his declaration:

> Although I concluded that the PIP that Ms. Ritchey's managers placed her on was not effective in guiding her to address her performance deficiencies such that she could meet their expectations, I believed that Ms. Ritchey's managers, including Duane Brock, genuinely tried to assist Ms. Ritchey through the use of the PIP process. It appeared to me that Ms. Ritchey's managers simply did not appreciate the amount of assistance and guidance that she needed in order to improve her performance. I also did not believe that Duane Brock, though well-meaning, had the supervisory training and experience necessary to provide meaningful assistance to Ms. Ritchey. I also observed nothing to indicate that Ms. Ritchey's management's efforts to assist her in improving her performance were insincere or designed with the intent to treat her unfairly, set her up for failure, or discriminate against her on any basis.

As a result of the investigation, Plaintiff was given an additional six months, until March 31, 2006, to meet her performance objectives.[14] (Ex. D. at p. 113). Also, as a result of the investigation,

---

[13] Bryant concluded that Brock's intent was to help Plaintiff, but that he had not been effective in doing so. (*Id*.).

[14] The parties' briefing indicates they agree that the extension was for six months. (*Compare* Doc. # 41 at ¶ 46 *with* Doc. #45 at ¶ 46.)

Brock and McElroy received coaching on how to better manage employees' performance. (Ex. D at pp. 152-53; 156-60). Although Bryant offered Plaintiff two different opportunities to provide feedback about the investigation, she did not do so. (Ex. D at 143-44; Ex. O at ¶ 10; Ex. J-62 at pp. 1274, 10586). Bryant indicated that it did not occur to him to be concerned with Plaintiff's failure to provide feedback because Plaintiff had told him that she was happy and had thanked him for "saving her job." (Ex. O at ¶ 10). Bryant closed out Plaintiff's investigation in November 2005. (Ex. O at ¶ 12). He contacted Ms. Ritchey on two separate occasions after he completed his investigation to determine if she was satisfied with it. (*Id*.). Plaintiff never responded to him on either occasion. (*Id*.).

As it turns out, Plaintiff was not satisfied at all. In December 2005, she filed the first of two Charges of Discrimination against Southern Nuclear with the Equal Employment Opportunity Commission ("EEOC"). (Ex. J-66). Her December 2005 EEOC (No. 130-2006-01373) charge she claimed she was discriminated against based upon her sex. (Ex. J-66).

In January 2006, following the conclusion of the investigation and after the decision to extend the time for Plaintiff to complete her PIP, Plaintiff was assigned to work on lighting issues at Plant Hatch. (Ex. GG at ¶ 2). Although this project was deemed something that a Senior Engineer should be able to handle easily, Plaintiff's performance on this project was the subject of complaints from both General Manager Dennis R. Madison and Engineering Manager Roger E. Varnadore at Plant Hatch. (Ex. M at ¶ 17; Ex. GG at 3-4; Ex. SS at 3-4). In fact, the managers at Plant Hatch instructed Brock's supervisor not to send Plaintiff back to the plant without their specific approval. (Ex. M at ¶ 17, Ex. GG at ¶ 4, Ex. SS at ¶ 3). Madison stated in his declaration that:

13

Although Ms. Ritchey interviewed employees and appeared to be working on the project, she never made any workable recommendations regarding Plaint lighting.  While Ms. Ritchey headed the lighting project, I also attended two presentations that she gave.  During both, her communication skills were poor and there was no logic or organization to the information she presented.  I was surprised that Ms. Ritchey was not better at presenting the lighting information given the number of years she had been in engineering and the topic area.  Ms. Ritchey appeared to lack the communication, technical, organizational and planning skills necessary to handle the project.

Following the presentation, Roger Varnadore and I spoke with Ken McElroy, Ms. Ritchey's manager, and asked that she not be allowed to return to the Plant unless I consented to her assignment and was aware of the specific tasks she would be performing.  My understanding, pursuant to my request of Mr. McElroy, was that Ms. Ritchey would be removed as the Senior Engineer primarily responsible for Plant Hatch lighting issues.  In my opinion based on observation, Ms. Ritchey was unable to produce a usable product on any project that did not have very specific boundaries.

(Ex. GG at ¶¶ 3-4).  Varnadore's declaration states:

From July 2004 to July 2006, I was the Engineering Support Manager for Plant Hatch.  During that time, I asked Ken McElroy, the Manager for Plant Hatch Support, to assign an engineer to assist me with a lighting project.  Specifically, I needed an engineer to study the lighting at Plant Hatch and make recommendations on areas that needed new or improved lighting.  Ms. Ritchey was assigned the task.

On numerous occasions during the lighting project, I asked Ms. Ritchey for status updates.  On each occasion, Ms. Ritchey was unable to provide a satisfactory update.  She consistently seemed scattered and unorganized.  I eventually asked Ms. Ritchey to prepare a presentation on the project to give to the Equipment Reliability Board ("ERB").  The presentation was made by teleconference because Ms. Ritchey advised me it was inconvenient for her to come to the Plant.  The presentation bombed.  It was disorganized and Ms. Ritchey had difficulty effectively communicating information about the project.  Following the teleconference, I asked Ms. Ritchey to try again with a live presentation to the ERB.  The live presentation was worse than the teleconference.  Ms. Ritchey appeared completely

> inept.  It was clear she either had not put time and effort into the
> presentation or was totally not capable.  Her verbal communication
> skills were completely lacking, as well.  Dennis Madison and I
> discussed Ms. Ritchey's poor performance and then we spoke with
> Mr. McElroy and asked him not to return her to the Plant.  Thereafter,
> Ms. Ritchey was replaced on the lighting project.
>
> In addition to the poor presentations on the lighting project, Ms.
> Ritchey did not make any meaningful progress or complete the tasks
> assigned to her.

(Ex. SS at ¶ 2-4).

Upon learning of these events, Burmeister directed Brock to personally meet with the site

managers to get a clear understanding of what their complaints were about Plaintiff.  (Ex. P at ¶ 11).

He and Brock concluded that the specific feedback that they received from the Plant Hatch managers

was consistent with the performance deficiencies that they had already identified in Plaintiff's PIP.

(*Id*.).  Burmeister recommended that Plaintiff's employment be terminated immediately.  (Ex. P at

¶ 12).  However, because Plaintiff had been given additional time to improve her performance,

Burmeister's recommendation was overruled and it was decided that the deadline for Plaintiff to

bring her performance up to expectations would remain March 31, 2006.  (Ex. P at ¶ 12 and Exhibit

4 thereto).

Shortly thereafter, on or about February 8, 2006, Plaintiff's psychologist recommended that

she stop working for a period of four to six weeks.  (Ex. J-117, J-118).  And sometime around

February 10, 2006, Plaintiff submitted a request for Family and Medical Leave, which was granted.

(*Id*.).

Plaintiff filed an Amended EEOC Charge on February 13, 2006.  (J-67).  Her February 2006

Charge asserted discrimination based upon sex, retaliation and "other."  (J-67).  None of the boxes

15

for race, religion, age, national origin or disability were checked.  (Ex. J-67).  Notably, neither the text of the original charge, nor that in the amended charge, contains any mention, reference, or even hint of age discrimination.  (Ex. J-67).

On or about May 8, 2006, Plaintiff was released to return to work with certain restrictions: no overtime, no travel, and no performance quotas.  (Ex. J-121).  The restrictions were to remain in place for four weeks.  (*Id*.).  As a nuclear power generation licensee, Defendant is required to comply with the Nuclear Regulatory Commission's (NRC) regulations governing the operation of nuclear plants and the qualifications of nuclear plant personnel.  (Ex. K at ¶ 4).  Such a licensee must implement a policy and procedure by which it can evaluate all of its candidates and employees to determine their fitness for duty.  (*Id*).  The NRC regulations pertaining to Fitness for Duty Programs ("FFD") require all nuclear power facilities to ensure compliance through the establishment and implementation of a written FFD Program.  (*Id*. at ¶ 5).  In response to this mandate by the NRC, Defendant implemented a FFD Program which specifically requires, in part, that an employee must be referred to a mandatory fitness for duty evaluation to be performed by an independent medical professional (licensed psychiatrist or psychologist) whenever credible information has been received and which causes concern regarding that employee's fitness for duty.  (*Id*. at ¶ 6).  Defendant's FFD Program[15] is designed to not only comply with NRC regulations, but to ensure the well-being and safety of the general public.  (*Id*. at ¶ 7).

When Plaintiff went on leave, her diagnosis was psychological in nature; therefore, her unescorted access to the nuclear plants was placed on hold by Defendant's medical director.  (Ex.

---

[15] The Safety and Health Department has safeguards in place to ensure that management does not use fitness for duty requirements in a discriminatory or retaliatory manner.  (*Id*. at ¶ 9).

G at pp. 52-54).  As a result, before she could be fully released to return to work, Plaintiff had to undergo a FFD evaluation.  On May 15, 2006, Plaintiff was referred to ValueOptions for an evaluation of her fitness for return to work.  (Ex. J-125).  Neither Brock, McElroy, or any other member of Plaintiff's management had any role in referring or evaluating Plaintiff under Defendant's FFD program.  (Ex. K at ¶¶ 10-12).  After reviewing pertinent records and conducting a face-to-face evaluation of Plaintiff, on May 26, 2006, Cory D. Caldwell, M.D. of ValueOptions recommended that, subject to the limitations imposed by Dr. Jeff Dolce, Plaintiff be permitted to return to work.  (Ex. J-125).

Plaintiff was not immediately returned to work.  Defendant's Medical Director, Dr. C. Calvert Dodson, III, is board certified in internal medicine and is a certified as a Medical Review Officer by the American Association of Medical Review Officers.  (Ex. K at ¶ 8).  Dr. Dodson's duties as Medical Director for Defendant include making determinations of fitness for duty as required by NRC regulations.  (*Id*.).  He is not an employee of Southern Nuclear; rather, Defendant contracts for Dr. Dodson's services as Medical Director.  (*Id*.).  Dr. Dodson's decisions on an employee's fitness for duty are final.  (*Id*.).  No Southern Nuclear employee can make FFD determinations.  (*Id*.).  Apparently one of the issues that Dr. Dodson had to consider in Plaintiff's case was whether it was reasonable to return an employee who had been on a PIP to work with no performance quotas.  While the FFD evaluation was in process, on or about June 16, 2006 (only three weeks after Dr. Caldwell's recommendation that she be returned to work), Plaintiff's release to return to work was rescinded because Plaintiff's condition had worsened.  (Ex. G at 52-54).  At that time, Dr. Dodson had not yet made a final determination regarding Plaintiff's fitness for duty.  (Ex. K at ¶ 13).

On or about August 8, 2006, Plaintiff went on long-term disability ("LTD") leave and began

receiving LTD benefits.  (Doc. # 20, Ex. 3 at p. 11).  Pursuant to Defendant Southern Nuclear's

Disability Leave of Absence Policy ("DLOA"), Plaintiff was entitled to up to 24 months of leave.

(Doc. # 20, Ex. 2 and 3, Ex. J-105).  Plaintiff remains employed by Defendant in an inactive status

and she admits that she has never been disciplined, demoted, or terminated by Southern Nuclear.

(Ex. A at p. 23; Ex. E at pp. 281:17-283:12, 293:8-20; Ex. D at p. 149:10-23).

Under Defendant's DLOA policy, employees seeking to return to work from disability leave

are required to identify vacant positions and apply for those positions.  Specifically, the policy

provides:

> Except as it may otherwise be addressed in Section IV, it is the
> responsibility of an employee seeking to return to active employment
> before the end of the Disability Leave of Absence to identify an
> available vacant position and apply for that position.  Prior to being
> offered an available vacant position, the employee must be qualified
> and able to perform the duties of that position.  Nothing in this policy
> shall require any Southern Company entity to hold open the job of an
> employee who goes on a Disability Leave of Absence or to find a job
> for an employee who is returning from a Disability Leave of Absence.

Doc. # 20, Ex. 1 at Ex. A, p. 2-3).

On July 11, 2007, the EEOC issued a Dismissal and Notice of Rights on Plaintiff's EEOC

charge.  (Doc. # 1, Ex. 3).  Plaintiff filed her Complaint on October 9, 2007.  (Doc. # 1).

On July 1, 2008, approximately one month before Plaintiff's LTD benefits were due to

terminate and her DLOA leave set to expire, Plaintiff's counsel contacted Defendant's counsel

regarding the procedures for Plaintiff to return to work. (Doc. # 20, Ex. 4).  On July 14, 2008,

Southern Nuclear's counsel advised Plaintiff's counsel that Plaintiff, like all employees returning

from DLOA leave, would be required to contact Southern Nuclear's Safety and Health department

("the S&H Department") and that once Plaintiff contacted the S&H Department, Plaintiff would be sent a letter outlining the return-to-work process in more detail. (Doc. # 20, Ex. 5). On July 15, 2008, Southern Nuclear's counsel directed Plaintiff's counsel to the terms of Southern Nuclear's DLOA policy which had previously been produced to Plaintiff in this litigation. (Doc. # 19, Ex. 4).

Plaintiff contacted S&H on July 15, 2008 and submitted her first job application on August 19, 2008. Since that time, Plaintiff has said she has applied for approximately 75-100 unspecified jobs.[16] Plaintiff was not hired for any of these positions and asserts that Defendant has re-hired retired male engineers to fill those vacancies. (Doc. # 46, Ex. 1).

## II.   Summary Judgment Standard

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. Once the moving party has met its burden, Rule 56(e) requires the non-moving party to go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial. *See id.* at 324.

---

[16] Plaintiff has not directed the court to any evidence regarding the particulars of the positions for which Plaintiff applied, other than that they are engineer positions at various levels. Plaintiff has further failed to show how her qualifications and experience compare to the requirements of these positions, or how they stack up against other applicants' qualifications and experience.

The substantive law will identify which facts are material and which are irrelevant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *See id.* 249.

## III. Discussion

After careful review, the court concludes that Defendant's summary judgment motion is due to be granted for the following reasons.

### A. Count One - Title VII Gender Discrimination

#### 1. This Is Not A Direct Evidence Case.

A plaintiff in an employment discrimination case maintains the ultimate burden of proving that the adverse employment decision was made because of intentional discrimination. *See Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133 (2000); *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 509-12 (1993); *Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1184 (11th Cir. 1984). Although the Supreme Court previously established the basic allocation of burdens and order of proof in a disparate treatment case, *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248 (1981), as modified by *Desert Palace v. Costa*, 539 U.S. 90 (2003), that allocation scheme applies only in cases where there is no direct evidence of discrimination, *Grigsby v. Reynolds Metals Co.*, 821 F.2d 590, 595 (11th Cir. 1987).

The Eleventh Circuit "has marked severe limits for the kind of language to be treated as direct evidence of discrimination." *Jones v. Bessemer Carraway Medical Ctr.*, 151 F.3d 1321, 1323 n.11 (11th Cir. 1998,). "'Direct evidence' ... is 'evidence, which if believed, proves existence of fact in issue *without inference or presumption*....  Evidence that only suggests discrimination,  ... or that is subject to more than one interpretation, ... does not constitute direct evidence.'" *Roberts v. Design & Mfg. Services, Inc.*, 167 Fed.Appx. 82, 84-85 (11th Cir. 2006) (quoting *Merritt v. Dillard Paper Co.*, 120 F.3d 1181, 1189 (11th Cir. 1997))(emphasis added). "[O]nly the most blatant remarks, whose intent could be nothing other than to discriminate ... constitute direct evidence of discrimination." *Carter v. Miami*, 870 F.2d 578, 582 (11th Cir.1989); *see also Schoenfeld v. Babbitt*, 168 F.3d 1257, 1266 (11th Cir. 1999).  Plaintiff does not contend there is any direct evidence (nor has any such evidence been presented) in this case.

Therefore, the discrimination claims in this case must be evaluated under the *McDonnell Douglas/Burdine* scheme.  That analysis requires a plaintiff to initially shoulder the burden of proving by a preponderance of evidence a *prima facie* case of discrimination.  Once the plaintiff proves a *prima facie* case, the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its employment decision.  Finally, if the defendant carries its burden, the plaintiff must *either* prove by a preponderance of the evidence that the legitimate reasons offered by the defendant are merely a pretext for discrimination *or* present sufficient evidence, of any type, for a reasonable jury to conclude that discrimination was a "motivating factor" for the employment action, even though defendant's legitimate reason may also be true or have played some role in the decision.  *McDonnell Douglas Corp.*, 411 U.S. at 802-05; *Burdine*, 450 U.S. at 252-54;  *Desert Palace*, 539 U.S. at 101-02.

21

### 2.   Plaintiff Has Failed to Establish a Prima Facie Case of Gender Discrimination

"In order to establish a prima face case, a plaintiff must present 'evidence adequate to create an inference that an employment decision was based on an [illegal] discriminatory criterion. . . .'" *Dent v. Federal Mogul Corp.*, 129 F.Supp. 2d 1311, 1314 (N.D. Ala. 2001) (quoting *O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308, 312 (1996) (quoting *Teamsters v. United States*, 431 U.S. 324, 358 (1977))).   Although the requirements to establish the prima facie case are flexible,[17] the Eleventh Circuit has frequently articulated the requirements along these lines:  "In order to establish a prima facie case of disparate treatment based on gender discrimination, a plaintiff must show four things: (1) that she is a member of a protected class; (2) that she was qualified for her job; (3) that she suffered an adverse employment action; and (4) that her employer treated similarly situated employees who are not members of the protected class more favorably."  *E.g., Wood v. K-Mart Corp.*, 273 Fed.Appx. 806, 807 (11th Cir. 2008) (citing *Rice-Lamar v. City of Ft. Lauderdale*, 232 F.3d 836, 842-43 (11th Cir. 2000)).

Plaintiff's gender discrimination assertions are hindered by the fact that she has failed to clearly identify the alleged adverse employment actions on which her claim is based.  Defendant has parsed the record to conclude that Plaintiff's gender discrimination claim is based upon her pay - *i.e.*, the failure to provide her merit increases and bonuses, and the failure to return her to work following her FMLA leave.  Plaintiff's opposition to Defendants' Motion for Summary Judgment does not make matters any clearer.  However, in her opposition, she also references her being placed on a PIP,

---

[17] More than one formulation of the elements of a prima facie case exist.  The Supreme Court in *McDonnell Douglas* recognized this when it stated that "[t]he facts necessarily will vary in Title VII cases, and the specification . . . of the prima facie proof required . . . is not necessarily applicable in every respect to differing factual situations."  411 U.S. at 802 n.13.

the denial of her request to transfer from under Brock's supervision, and the failure to return her to work.

### a.      Plaintiff's PIP Claim

Plaintiff's gender discrimination claim in this case cannot be based upon her being placed on a PIP because such a claim would be untimely. *See* 42 U.S.C. § 2000e-5(e)(1) (requiring that a plaintiff file discrimination charge with the EEOC within 180 days of the alleged adverse employment action). Plaintiff filed her first EEOC charge on December 12, 2005. However, she was placed on the PIP in May 2004, over eighteen months before her initial charge was filed. Further, she cannot base her gender discrimination claim on the revised PIP which imposed a deadline to improve her performance because she was informed of that decision on April 22, 2005 – again, a date more than 180 days before her EEOC charge was filed. *See, e.g., Stewart v. Booker T. Washington Ins.,* 232 F.3d 844,848 (11th Cir. 2000) ("Title VII requires a plaintiff to file a charge with the EEOC no more than 180 days after 'the alleged unlawful employment practice occurred.'").

### b.      Plaintiff Cannot Show That Defendant's Failure to Transfer Her Was an Adverse Employment Action

"A plaintiff 'must show a serious and material change in the terms, conditions, or privileges of employment' to establish an adverse employment action." *Hyde v. K.B. Home, Inc.*, 2009 WL 4269800, * 2-3 (11th Cir. 2009) (quoting *Davis v. Town of Lake Park, Fla.*, 245 F.3d 1232, 1240 (11th Cir. 2001)). To be considered an adverse employment action under Title VII, an action must involve a reduction in "pay, prestige, or responsibility." *Hyde*, 2009 WL 4269800 at * 2-3 (quoting *Hinson v. Clinch County, Ga. Bd. Of Educ.*, 231 F.3d 821, 828-29 (11th Cir. 2000)). "[T]emporary changes in work assignments that were essentially demotions but did *not* change the employee's pay

status did not meet the definition of adverse employment action.  *Hyde,* 2009 WL 4269800 at * 2-3

(citing *Davis.*, 245 F.3d at 1240) (emphasis in original).  Under these standards, Plaintiff's pay claim

qualifies as an adverse employment action, as would the refusal to return her to work following her

FMLA leave.  However, the refusal to allow her transfer would not, because Plaintiff has not pointed

to anything in the Rule 56 file which shows that a transfer would involve a change in the terms,

conditions or privileges of employment, nor that it would affect a reduction in pay, prestige, or

responsibility.  Rather, a transfer away from Brock merely represents a change desired by Plaintiff

to which she has failed to show she was entitled.

### c.  Plaintiff's Title VII Pay and Failure to Return to Work Claims

The court now turns to analyzing Plaintiff's claim that she was discriminated against based

upon her gender in the areas of pay and the failure to return her to work after FMLA leave.  With

respect to each of these claims, Plaintiff has failed to satisfy the element of her prima facie case

which requires her to prove that there were employees, not within her protected class, who were

similarly situated in all relevant respects, but who were treated more favorably.  *Wilson v. B/E

Aerospace, Inc.*, 376 F.3d 1079, 1091 (11th Cir. 2004).  In *Jones v. Bessemer Carraway Med. Ctr.*,

137 F.3d 1306, 1301 (11th Cir. 1998), *modified and reh'g denied*, 151 F.3d 1321 (1998), the

Eleventh Circuit emphasized the necessity of showing that similarly situated employees outside the

Plaintiff's protected class were treated more favorably: "It is this showing – and not the

demonstration of [discriminatory] animus alone – that addresses the fundamental issue in a Title VII

disparate treatment case: whether the defendant intentionally discriminated against the plaintiff."

*Jones*, 137 F.3d at 1313 (citations omitted); *see also Maniccia v. Brown*, 171 F.3d 1364, 1368 (11th

Cir. 1999); *Silvera v. Orange County School Board*, 244 F.3d 1253, 1259 (11th Cir. 2001); *Johnson*

*v. England*, 2009 WL 2514099, at * 3 (11th Cir. 2009) ("A plaintiff must show that a possible comparator is 'similarly situated in all relevant respects' and is 'nearly identical to the plaintiff.'") (quoting *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1087 (11th Cir. 2004)).[18]  In addressing her gender discrimination claim, Plaintiff merely recites a litany of complaints and makes conclusory allegations that males were paid more than her.  Never, however, does she place these allegations in any factual context by identifying any specific, similarly situated comparator who was treated more favorably (*i.e.*, paid more) than her.[19]  Plaintiff has the burden of showing that she and the alleged comparator employees are similarly situated in all relevant respects.  *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997).  She has failed to make such a showing.  Therefore, Plaintiff has failed to establish a prima facie case on her gender discrimination claim.

### 3.   Defendant's Legitimate, Non-Discriminatory Reasons

Even if Plaintiff had established a prima facie case of gender discrimination with respect to her pay, PIP, transfer, or return to work claims (and to be clear she has not), Southern Nuclear has articulated legitimate, non-discriminatory reasons for the adverse employment actions at issue in this case.  Specifically, Southern Nuclear articulated that "(1) Ritchey did not receive a merit increase or bonus because her documented poor performance disqualified her for an increase or bonus; and

---

[18] Although in *Alexander v. Fulton County, Ga.*, 207 F.3d 1303, 1334 (11th Cir. 2000), a panel of the Eleventh Circuit called into question its "nearly identical" standard, as the standard enunciated by the earlier panel, that standard is controlling.  *Maniccia v. Brown*, 171 F.3d 1364, 1368 (11th Cir. 1999); *Burke-Fowler v. Orange County, Fla.*, 447 F.3d 1319, 1323 n. 2 (11th Cir. 2006).

[19] In the context of her Equal Pay Act claim, Plaintiff identifies two male employees who were paid more than she was.  However, she makes no argument in reference to her Title VII claim that they are appropriate comparators.  Indeed, the standard for identifying appropriate comparators is much more stringent under Title VII, *i.e.*, they must be 'nearly identical to the plaintiff' in 'all relevant respects.'  *Johnson*, 2009 WL 2514099 at * 3; *Wilson*, 376 F.3d at 1087.

(2) she was required to go through the FFD process prior to being returned to work." (Doc. # 40, Ex. J-100, J-119 – J-121, Ex. K; Doc. # 41-2 at 33). Thus, she was not eligible to return to work or to "transfer" to a different position. Although Defendant did not argue Plaintiff's inability to show pretext on her untimely claim that her PIP was discriminatory, Defendant has articulated that she was placed on the PIP at Jones's recommendation based upon her poor performance, including Jones's own experience with her performance.

Where, as here, a "defendant articulates one or more [legitimate, non-discriminatory] reasons, the presumption of discrimination is eliminated and 'the plaintiff has the opportunity to come forward with evidence . . . sufficient to permit a reasonable fact finder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision.'" *Chapman v. Al Transport*, 229 F.3d 1012, 1024-25 (11th Cir. 2000) (citing *Combs v. Plantation Patterns*, 106 F.3d 1519, 1527-28 (11th Cir. 1997) (citations omitted). "If the plaintiff does not proffer sufficient evidence to create a genuine issue of material fact regarding whether each of the defendant employer's articulated reasons is pretextual, the employer is entitled to summary judgment on the plaintiff's claim." *Chapman*, 229 F.3d at 1024-25 (citing *Combs*, 106 F.3d at 1529).

### 4.    Plaintiff Has Not Established That Defendant's Reasons For Its Actions Are A Pretext for Gender Discrimination.

If an employer "articulates one or more [legitimate, non-discriminatory] reasons, the presumption of discrimination is eliminated and 'the plaintiff has the opportunity to come forward with evidence . . . sufficient to permit a reasonable fact finder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision.'" *Chapman v. AI Transport*, 229 F.3d 1012, 1024-25 (11th Cir. 2000) (citing *Combs v. Plantation Patterns*, 106 F.3d

1519, 1527-28 (11th Cir. 1997) (citations omitted)).  Here, Defendant has articulated legitimate, nondiscriminatory reasons and, therefore, the court turns to the "focused" inquiry concerning whether Plaintiff can show pretext.  *Silvera v. Orange County School Board*, 244 F.3d 1253, 1258 (11th Cir. 2001).

"A plaintiff may not recast an employer's proffered non-discriminatory reasons or substitute his business judgment for that of the employer.  Provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet the reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason." *Hammock v. Nexcel Synthetics, Inc.*, 201 F. Supp. 2d 1180, 1187 (N.D. Ala. 2002) (quoting *Chapman*, 229 F.3d at 1029 (citing *Alexander v. Fulton County*, 207 F.3d 1303, 1341 (11th Cir. 2000) and *Combs*, 106 F.3d at 1541-43))).  "It is not the court's role to second-guess the wisdom of an employer's decisions as long as the decisions are not [discriminatory]."  *Alexander*, 207 F.3d at 1341; *see also Combs*, 106 F.3d at 1541-43.

A plaintiff may establish pretext in at least two ways: by showing that (1) "a discriminatory reason more likely motivated" a decision or (2) "the employer's proffered reason is unworthy of credence."  *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 256 (1981).  Plaintiff's opposition to Defendants' Motion for Summary Judgment does not present a cohesive legal argument that Southern Nuclear's reasons for its decisions are pretextual.

### a.    Pretext Arguments Regarding Plaintiff's Pay Claim

In attacking Southern Nuclear's reasons for paying her less, Plaintiff argues that there is no evidence that she was a poor performer.  But this argument fails for two reasons:  one factual, and one legal.  Factually, it ignores a Rule 56 record that is replete with indications that a number of

people at Southern Nuclear had concerns about Plaintiff's performance, and that list does not merely include Brock, the subject of Plaintiff's ire.  For example, the undisputed testimony from Plaintiff's supervisor prior to Brock, Larry McWhorter is that McWhorter considered Plaintiff one of the lowest performers in his group.  He found that she required more supervision, and was less productive, than her peers.  Nevertheless,  he never gave Plaintiff an "unacceptable" rating because he perceived her performance to be on *the borderline of* "acceptable."  This is important because the Rule 56 evidence shows that Plaintiff's starting pay at Southern Nuclear was set based upon her performance during prior years at Southern Company.  Plaintiff's prior supervisor's assessment of her as one of his lowest performers, together with similar assessments from David Jones, and complaints from the Site Plant Manager and the Engineering Manager at Plant Hatch regarding her performance, show that there were legitimate, non-discriminatory reasons for her to be paid less than male engineers (even if she had identified any appropriate comparators, which she did not).

But there is also a legal reason that Plaintiff cannot show pretext in this respect.  Here, Plaintiff has not done anything to attack this evidence other than disagree with it.  As the court stated in *Holifield v. Reno*, 115 F.3d 1555 (11th Cir. 1997):

> The inquiry into pretext centers upon the employer's beliefs, and not the employee's own perceptions of his performance. *Billet v. CIGNA Corp.*, 940 F.2d 812, 818-22 (3rd Cir. 1991). *See Sempier v. Johnson & Higgins*, 45 F.3d 724, 731 (3rd Cir. 1995); *Gray v. U. of Arkansas at Fayetteville*, 883 F.2d 1394, 1401 (8th Cir. 1989); *Weihaupt v. American Medical Ass'n*, 874 F.2d 419, 428 (7th Cir. 1989); *Smith v. Flax*, 618 F.2d 1062, 1067 (4th Cir. 1980) (perception of decisionmaker, not employee, is relevant).

*Holifield*, 115 F. 3d at 1565. Thus, Plaintiff has not established that Southern Nuclear's assertion that Plaintiff was a poor performer is a pretext for gender discrimination.

28

To survive a properly supported motion for summary judgment, Plaintiff must "meet [Defendants'] reason head on and rebut it," and she "cannot succeed by simply quarreling with the wisdom of that reason." *Chapman*, 229 F.3d at 1030 (citing *Alexander*, 207 F.3d at 1341). To the extent Plaintiff presents argument in opposition to Defendants' properly supported summary judgment, it does nothing more than quarrel with the wisdom of Defendant's conclusion that she was a poor performer. This is insufficient to establish pretext.

### b.      Pretext Arguments Regarding Plaintiff's PIP Claim

Plaintiff's pretext argument (to the extent that she has presented one) with regard to her PIP claim is the same as for her pay claim. Plaintiff merely disputes that she was a poor performer. Again, this ignores the evidence in the Rule 56 record, including the testimony from McWhorter that Plaintiff was one of the lowest performers under his supervision and from Jones that he recommended the PIP based on his own experience with Plaintiff's performance. Because Plaintiff does nothing more than quarrel with the wisdom of Defendant's conclusion that she was a poor performer, she has failed to establish pretext.

### c.      Pretext Arguments Regarding Plaintiff's Return to Work and Transfer Claims

Plaintiff's only response to the legitimate, non-discriminatory reasons that she was not returned to work and not transferred, *i.e.*, that she was required to go through the FFD process prior to being returned to work or allowed to "transfer" to a different position, are affidavits establishing that other employees are occasionally allowed to transfer. However, this evidence does not address the question presented here: are there other cases where employees on PIP were allowed to transfer, or whether other similar employees were allowed to return to work without going through the FFD

process.  The evidence presented by Plaintiff again fails to meet Defendant's reasons head on and

rebut them.  *Chapman*, 229 F.3d at 1030   Therefore, Plaintiff has again failed to establish pretext.

Plaintiff has not only failed to establish a prima facie case with regard to the identifiable

alleged adverse employment actions, but has also failed to establish either that Defendant's proffered

reasons are unworthy of credence, or that Defendant was more likely motivated by a discriminatory

reason.  Accordingly, Defendant is entitled to summary judgment on Plaintiff's Title VII gender

discrimination claim.

### B.    Count Two - Equal Pay Act

To establish a prima facie case under the Equal Pay Act, a plaintiff is required to prove at

trial "that an employer pays different wages to employees of opposite sex 'for equal work on jobs

the performance of which requires equal skill, effort, and responsibility, and which are performed

under similar working conditions.'"  *Corning Glass Works v. Brennan*, 417 U.S. 188, 195 (1974)

(quoting 29 U.S.C. § 206(d)(1)). Thus, an EPA plaintiff need not prove that the jobs held by her male

comparators are identical to hers; instead, she must demonstrate only that the skill, effort and

responsibility required in the performance of the jobs are "substantially equal."  29 U.S.C. §

206(d)(1); *Corning Glass Works*, 417 U.S. at 204; *Brock*, 765 F.2d at 1032.

"Once a prima facie case is demonstrated, to avoid liability the employer must prove by a

preponderance of the evidence, ...  that the differential is justified by one of four exceptions set forth

in the EPA, ...(i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by

quantity or quality of production; or (iv) a differential based on any other factor other than sex."*Irby

v. Bittick*, 44 F.3d 949, 955 (11th Cir. 1995) (citing 29 U.S.C. § 206(d)(1); *Corning Glass Works*,

417 U.S. at 196-97; and *Mulhall v. Advance Sec., Inc.*, 19 F.3d 586, 590 (11th Cir. 1994))(internal

citations omitted).   "The employer bears the burden of proof for these affirmative defenses."   *Irby*, 44 F.3d at 955 (citing *Corning Glass Works*, 417 U.S. at 196-97; *Price v. Lockheed Space Operations Co.*, 856 F.2d 1503, 1505 (11th Cir. 1988); *Meeks v. Computer Assocs. Int'l*, 15 F.3d 1013, 1018 (11th Cir. 1994)).   If the defendant meets its burden, the plaintiff must rebut the explanation by showing with affirmative evidence that the reason is pretextual or offered as a post-event justification for a gender-based differential.   *Irby*, 44 F.3d at 955 (citing *Schwartz v. Florida Bd. of Regents*, 954 F.2d 620, 623 (11th Cir. 1991)) (other citations omitted).   If a plaintiff's rebuttal is sufficient to create an inference of pretext, there is a material issue which must be resolved at trial. *Irby*, 44 F.3d at 955.

Southern Nuclear has presented Rule 56 evidence that establishes that Plaintiff's starting pay at Southern Nuclear was determined by her pay at Southern Company, where her last supervisor had considered her one of his lowest performing employees.   Plaintiff's pay was lower than the male engineers transferred from Southern Company to Southern Nuclear to report to Brock.   However, her pay was within the range, above the minimum, for a Senior Engineer.   The Rule 56 evidence also shows that after her transfer to Southern Nuclear, Plaintiff's performance reviews did not entitle her to a pay increase under the relevant policies.[20]   For instance, in 2004 and 2005, Ritchey did not

---

[20] The fact that Defendant has presented Rule 56 evidence that Plaintiff missed or received lower pay raises due to performance reviews is important because the Eleventh Circuit has said that while the other factor relied upon by Defendant (starting pay), standing alone, may be insufficient to allow an employer to carry its burden of establishing a factor other than sex:

an Equal Pay Act defendant may successfully raise the affirmative defense of "any other factor other than sex" if he proves that he relied on prior salary and experience in setting a "new" employee's salary. While an employer may not overcome the burden of proof on the affirmative defense of relying on "any other factor other than sex" by resting on prior pay alone, as the district court correctly found, there is no prohibition on utilizing prior pay as part of a mixed-motive, such as prior pay and

receive a pay raise because, under the same neutral pay matrix, her performance reviews did not entitle her to a raise. Thus, Plaintiff's low performance compared to her peers, not her gender, explains her lower pay (as compared to better performing male employees who qualified for pay increases and bonuses).

Because, as discussed above, Defendant has presented substantial evidence that there are reasons "other than sex" for the disparity in Plaintiff's pay, Plaintiff "must rebut the explanation by showing with affirmative evidence that it is pretextual or offered as a post-event justification for a gender-based differential." *Steger v. General Elec. Co.*, 318 F.3d 1066, 1077 (11th Cir. 2003) (quoting *Irby*, 44 F.3d at 954). Plaintiff names two comparators on her equal pay claim who made more than her, one who started in the co-op program a year before she did in 1977 (Rick Edge), and one who started his employment a year after she did in 1981 (John Reed). Despite the evidence regarding Plaintiff's performance history, Plaintiff argues that there is no reasonable explanation for her to be paid less than Edge and Reed. However, the summary judgment record shows that pay increases were based on a number of factors, and that employees who received higher performance ratings generally received greater pay increases. The undisputed Rule 56 evidence establishes that

---

> more experience. This court has not held that prior salary can never be used by an employer to establish pay, just that such a justification cannot solely carry the affirmative defense. *See Glenn* [*v. General Motors Corp.*, 841 F.2d 1567, 1571 n.9 (11th Cir. 1988)], ("*Kouba* [*v. Allstate Ins. Co.*, 691 F.2d 873 (9th Cir. 1982)] is consistent with the present case because the Ninth Circuit would permit use of prior salary where the prior job resembled the sales agent position and where Allstate relied on other available predictors."). The question is whether "other business reasons ... reasonably explain the utilization of prior salary." *Price*, 856 F.2d at 1506. As demonstrated below, this case clearly presents other business reasons that justify use of prior salary, principally, experience with the division.

*Irby*, 44 F.3d at 955-56.

Plaintiff was considered one of the lowest performers.  Plaintiff has presented no evidence that this reason is a pretext for gender bias.  For example, no evidence has been presented to show that these two employees received performance ratings similar to Plaintiff's, yet received larger pay increases.

Plaintiff also strenuously argues that Defendant Southern Nuclear "fabricated" these performance issues.  But that argument is based upon her own perception of her performance, the positive comments of various peers contained in affidavits which she submitted in opposition to Defendants' Motion for Summary Judgment, and one supervisor who said he knew of no reason he would not have wanted Plaintiff under his supervision.  The testimony Plaintiff points to does not rebut the undisputed evidence showing that Plaintiff was considered by a number of Southern Nuclear supervisors to have performance problems.  She was viewed as one of the lowest performers by her last Southern Company supervisor she had before transferring to Southern Nuclear.  And after the transfer, her performance did not meet her Southern Nuclear supervisors' expectations.  Nor do Plaintiff's contentions negate the fact that she was the only engineer under Brock placed on a PIP and that two internal "customers" complained about her performance and asked that she not return to their plant.

Defendant has presented substantial evidence supporting its position that the difference in pay between Plaintiff and the other senior engineers was based upon factors other than sex.  Plaintiff has failed to rebut adequately those justifications and thus has failed to raise a disputed material issue of fact.  *Irby*, 44 F.3d 957.  Therefore, Defendant is entitled to summary judgment on Count Two of Plaintiff's Complaint.

**C.**     **Count Three - Age Discrimination**

    **1.**     **Plaintiff Has Failed to Exhaust Administrative Remedies With Respect to Her Age Discrimination Claim**

Count Three of Plaintiff's Complaint asserts a claim under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621, et. seq.  "It is well established that the timely filing of an EEOC charge is a prerequisite to a civil action based upon either Title VII or the ADEA, and a plaintiff who fails to file a timely charge of discrimination is precluded from bringing a civil action because of a failure to exhaust his or her administrative remedies." *Lett v. Reliable Ruskin*, 2005 WL 2128041, * 2 (M.D. Ala. 2005) (citing *McBrayer v. City of Marietta*, 967 F.2d 546, 547 (11th Cir. 1992) (ADEA) and *Calhoun v. Fed. Nat'l Mortgage Ass'n*, 823 F.2d 451, 455 (11th Cir. 1987) (ADEA)).

Neither of the charges of discrimination which Plaintiff filed with the EEOC alleged age discrimination.  That is, Plaintiff did not check the box for age discrimination on either her original charge of discrimination dated December 12, 2005, or her amended charge dated February 13, 2006. Nor is there any reference to age discrimination, directly or indirectly, in the text of either charge.

Plaintiff points out that a judicial claim that is like or related to, or grew out of, the allegations contained in her EEOC charge may be asserted in federal court, even if that claim was not expressly stated in the charge.  However, while that is a correct statement of the legal principle, it does her no good whatsoever here.  An age discrimination claim cannot be said to be like or related to claims of gender discrimination and retaliation.  Different types of "judicial claims are allowed if they 'amplify, clarify, or more clearly focus' the allegations in the EEOC complaint ... ." *Gregory v. Ga. Dep't of Human Resources*, 355 F.3d 1277, 1279-80 (11th Cir. 2004) (citing *Wu v. Thomas*,

863 F.2d 1543, 1547 (11th Cir. 1989)).   However, the Eleventh Circuit has "cautioned that allegations of new acts of discrimination are inappropriate." *Gregory*, 355 F.3d at 1279-80 (citing *Wu,* 863 F.2d at 1547).

Plaintiff's argument about Defendant Southern Nuclear's internal documentation is inapposite.  "The purpose of this exhaustion requirement 'is that *the [EEOC]* should have the first opportunity to investigate the alleged discriminatory practices to permit it to perform its role in obtaining voluntary compliance and promoting conciliation efforts." *Gregory*, 355 F.3d at 1280 (citing *Evans v. U.S. Pipe & Foundry Co.*, 696 F.2d 925, 929 (11th Cir. 1983) and *Wu*, 863 F.2d at 1548 ("The purpose of the filing requirement is to insure that the settlement of grievances be first attempted *through the office of the EEOC*.")) (emphasis added).  Had the text of Plaintiff's EEOC charges even *hinted* at age discrimination, the court's conclusion might be different.  But, when no reference to age discrimination can even be inferred from any part of the text, a plaintiff has not exhausted her administrative remedies on this claim.

>    **2.    Plaintiff Has Failed to Establish a Prima Facie Case of Age Discrimination**

Even if Plaintiff's age discrimination were not barred due to her failure to exhaust administrative remedies (and, to be sure, it is), that claim fails for the same reasons that her Title VII gender discrimination claim fails – she has utterly failed to present a prima facie case by identifying any appropriate comparators who were treated more favorably.

Plaintiff's Opposition Brief identifies three allegedly younger employees, two male and one female, who Plaintiff claims were treated more favorably that her.  The record evidence, however, does not establish either that these employees were younger than Plaintiff, or that they were similarly

situated to Plaintiff in all relevant respects.  Michelle Shepherd was not hired as a Senior Engineer.

The record is devoid of any information establishing Ifti Rana's age.[21]  The record shows Sylvie

Thomas's college graduation year as 1969.  Plaintiff was born in 1957 and graduated from college

in 1981.

But these are not the only shortcomings in Plaintiff's submissions.  She has not shown that

any of these employees were "nearly identical" to her in "all relevant respects." *Johnson*, 2009 WL

2514099 at * 3; *Wilson*, 376 F.3d at 1087.  Plaintiff must do more than identify and nominate

persons who are allegedly comparators.  However, here, that is all she has done and having done only

that, Plaintiff has failed to establish a prima facie case of an age discrimination claim.[22]

For all these reasons, Defendant Southern Nuclear is entitled to summary judgment on Count

Three of Plaintiff's Complaint, her ADEA claim.

---

[21] Defendant states that it did not include this evidence in support of summary judgment because Plaintiff had previously failed to name any comparators on her purported age discrimination claim.  However, Defendant states that Ifti Rana and Sylvie Thomas are ages 60 and 64, respectively, and thus both older than Plaintiff.  The point, however, is not what ages Defendant assigns to these employees in its brief; rather, the key is that Plaintiff has not presented any evidence of their ages in the Rule 56 record when it was her burden to do so.

[22] Indeed, Plaintiff's prima facie case of age discrimination is even weaker.  In her deposition, Plaintiff did not claim that the employees in her group were treated better than her, but rather that younger females who worked elsewhere in the company were treated better.  When asked to identify these younger females, however, Ritchey said that she was not referring to "anyone in particular." (Ritchey Depo. 371:8-374:4).  She has not stated how these unspecified younger women were treated better than her.  Moreover, because she was the only female in her work group, these unnamed females must have had different supervisors than Plaintiff.  *See Silvera*, 244 F.3d at 1261 n.5 ("[D]ifferences in treatment by different supervisors or decision makers can seldom be the basis for a viable claim of discrimination.").

**D.      Count Four - Retaliation**[23]

**1.      The Alleged Retaliatory Conduct**

To establish a prima facie case of retaliation, a plaintiff must present evidence showing that (1) she engaged in statutorily protected expression, (2) her employer took action that would have been materially adverse to a reasonable employee, and (3) some causal relation existed between the two events. *See Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68-69 (2006) (announcing "materially adverse" element); *Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2001).

It is undisputed that Plaintiff engaged in statutorily protected conduct.  Plaintiff's internal complaints of discrimination arguably began in February 2005 when, in the Corporate Compliance Survey completed by Plaintiff, she answered "yes" to the question:

> In 2004, were you subjected to intimidation, harassment, or discrimination in the workplace based on race, sex, age, color, religion, national origin, sexual orientation, veteran's status or disability?  (If yes, please explain.  It is not necessary to identify incidents that have already been reported and satisfactorily resolved.)

She made the following comment regarding her answer: "I would like to reserve this issue and discuss possibly at a later time, but not now."  On May 2, 2005, Plaintiff submitted a Concern Form to Bryant.  The concern stated that Plaintiff felt that she was "being singled out and treated unfairly by [her] supervisor."  Bryant followed up with Plaintiff about filing a formal concern and, although she declined to do so, on May 3, 2005, she told Bryant that she felt she was being singled out because she was the only female in her group.    In August 2005, Plaintiff approached Brock's

---

[23] In her Complaint, Plaintiff asserted a retaliation claim against Brock as well as Southern Nuclear.  However, the retaliation claim against Brock has been dismissed by agreement of the parties.  (Doc. # 14).

supervisor, McElroy, about her complaints that Brock was treating her unfairly. Thereafter, on August 19, 2005, Plaintiff filed a formal concern with Southern Nuclear's Corporate Concerns, Program.[24]  On December 12, 2005, Plaintiff filed the first of two Charges of Discrimination.  The second charge, which was an amendment to the first, was filed on February 13, 2006.

Notwithstanding the fact that she engaged in protected activity, Plaintiff's retaliation claim is something of a moving target.  Previously, in her Emergency Motion for Immediate Instatement and/or Injunctive Relief, Plaintiff indicated that her retaliation claim was based upon her contention that Defendant's DLOA policy has a disparate impact on a protected class in that it allegedly screens for disability and the exercise of rights under the Family and Medical Leave Act.  (Doc. # 21 at 2-4). But the court rejected Plaintiff's claim in this regard because Plaintiff's Complaint states neither a claim under the Americans with Disabilities Act,[25] nor a claim under the FMLA.  (Doc. # 24 at 4).

Plaintiff's Opposition to Defendant's Motion for Summary Judgment presents a different theory regarding her retaliation claim.  The conduct that she now alleges is retaliatory is "an adverse performance review and another PIP," denial of plant access in December, the decision to terminate her at the end of March, and Defendant Southern Nuclear's failure to return her to work following

---

[24] Hugh Bryant investigated Plaintiff's complaints and, on October 25, 2005, concluded his investigation with a written report in which he found that, while Plaintiff's performance was unsatisfactory to her management, that performance had not been managed effectively.  (Doc. # 42, Pl. Ex. 16)

[25] Similarly, neither Plaintiff's original or amended EEOC charge make any allegation of disability discrimination.

her FMLA leave.[26]  Plaintiff also asserts that she "continues to be denied employment in retaliation." Doc. # 47 at 55-56).

>    **2.     Plaintiff Cannot Establish a Prima Facie Case With Respect to Her Being Continued on a PIP or Denied Access to Plant Hatch**

Plaintiff's discussion of a prima facie case lists the elements of her retaliation claim and states the conclusion that, because she engaged in protected conduct and "thereafter" certain alleged adverse employment actions occurred, there is a causal connection between the two.  At least with respect to Plaintiff's receipt of adverse employment reviews and being continued on a PIP, Plaintiff cannot establish a causal connection between her statutorily protected activity and these employment actions.  This is because the undisputed evidence in the record demonstrates that Plaintiff began receiving unfavorable performance appraisals and the PIP process was initiated *before* Plaintiff engaged in any protected conduct.[27]  When the protected conduct had not yet occurred, it is simply impossible for the decision maker to have considered the protected conduct.  *See, e.g. Brungart v. Bellsouth Telecomms., Inc.*, 231 F.3d 791, 799 (11th Cir. 2000) ("A decision maker cannot have been motivated to retaliate by something unknown to him."); *Gupta v. Fla. Bd. of Regents*, 212 F.3d 571, 590 (11th Cir. 2000) (a causal connection between the protected activity and an adverse employment action cannot be established where the decision-makers were not aware of the protected conduct).

---

[26] Plaintiff also states that she "claims interference and retaliation in violation of the FMLA." (Doc. # 47 at 51).  However, again, Plaintiff's Complaint does not state a claim under the FMLA.

[27] Plaintiff's reference in her retaliation claim to the alleged "denial of plant access in December" is somewhat puzzling.  There is no reference to such an event in Plaintiff's statement of additional undisputed facts.  Nor is there any reference to this assertion as one of Plaintiff's "complaints" either in the investigation of her formal concern, or in either of her EEOC charges.  Rather, the only reference to plant access is found in Defendants' statement of facts.

This same conclusion is true with respect to Plaintiff's claims related to denial of plant access and the failure to return her to work following her FMLA leave, albeit for a slightly different reason. Plaintiff cannot establish a causal connection between any protected activity and the "denial of plant access" because the undisputed evidence is that Southern Nuclear received complaints from both the Plant Hatch Engineering Manager and the Site Plant Manager about Plaintiff's poor performance. It was those two managers – Madison and Varnadore – who indicated to McElroy that *they* did not want Plaintiff back at their plant, and there is nothing in the Rule 56 record to suggest that either of those managers was aware of her engaging in any protected activity.  To establish retaliation, and the causal relation between the adverse employment action and the protected activity, a plaintiff must generally show at a minimum that the decision maker was aware of the protected conduct at the time of the adverse employment action.  *See Goldsmith v. City of Atmore*, 996 F.2d 1155, 1163 (11th Cir. 1993); *Raney v. Vinson Guard Serv., Inc.*, 120 F.3d 1192, 1197 (11th Cir. 1997) ("[I]n a case involving a corporate defendant the plaintiff must show that the corporate agent who took the adverse action was aware of the plaintiff's protected expression... .").  That requirement rests upon common sense.  A decision maker cannot have been motivated to retaliate by something unknown to him.  And while such awareness can be established by circumstantial evidence, *see Goldsmith*, 996 F.2d at 1163; *Brungart v. BellSouth Telecommunications, Inc.*, 231 F.3d 791, 799 (11th Cir. 2000), there is nothing at all in the record to suggest that Madison or Varnadore were so aware.

### 3.    Plaintiff Cannot Show That Defendant's Reasons For the Employment Actions Challenged Where a Pretext For Retaliation

Nevertheless, even if the court were to assume for purposes of summary judgment that Plaintiff has established a prima facie case on all but her retaliatory failure to re-hire claim (which

40

will be discussed separately below), Southern Nuclear is still entitled to summary judgment in this case. If Plaintiff presents evidence establishing a prima facie case of retaliation, the appropriate legal analysis does not stop there.[28]  "Once a plaintiff establishes a prima facie case, the burden of production shifts to the employer who must proffer a legitimate, non-retaliatory reason for the adverse employment action." *Corbitt v. Home Depot U.S.A., Inc.*, 589 F.3d 1136, 1156 (11th Cir. 2009) (citing *Crawford v. Carroll*, 529 F.3d 961, 976 (11th Cir. 2008)).  Here, Southern Nuclear has referred the court back to its discussion of the legitimate, non-discriminatory reasons it had for the employment decisions Plaintiff has challenged under Title VII.  Thus, where as here an employer offers "a legitimate reason for the employment action, the plaintiff must then demonstrate that the employer's proffered explanation is a pretext for retaliation." *Corbitt*, 589 F.3d at 1156 (citing *Crawford*, 529 F.3d at 976).  "In reviewing a summary judgment motion, the district court must evaluate whether the plaintiff has demonstrated such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Corbitt*, 589 F.3d at 1162 (internal quotation marks omitted).  Conclusory allegations, without more, are insufficient to show pretext. *Mayfield v. Patterson Pump Co.*, 101 F.3d 1371, 1376 (11th Cir. 1996).

### a.     Pretext Arguments Regarding Her PIP Claim

The court begins with Plaintiff's assertion that she received certain performance reviews and was continued on a PIP in retaliation for engaging in protected activity.  Even if Plaintiff had established a prima facie case regarding this contention, she cannot show that Defendant's reasons

---

[28] Unfortunately, while the legal analysis of a retaliation claim does not end upon the finding that a plaintiff has established a prima facie case, that is the end of Plaintiff's analysis in her opposition brief.  (Doc. # 47 at 50-52).

for doing these things were pretextual.  Again, other than quarreling with her supervisors' evaluation of her performance, Plaintiff has not established, or even argued in reference to her retaliation claim, that those reasons were a pretext for retaliation.

### b.    Pretext Arguments Regarding Plant Access

The same conclusion is true with respect to Plaintiff's plant access contention.  Even if she had established a prima facie case with respect to that claim, she cannot show that the reason Defendant has assigned for this action was a pretext for retaliation.  The legitimate, non-retaliatory reason Plaintiff was denied plant access was the internal customer complaints requesting that she not be sent back.   Plaintiff cannot dispute those complaints were received.  Nor can she argue on this record that they were anything other than a product of her own substandard performance at Plant Hatch.  Finally, there is nothing to suggest that the internal customers who complained about her even knew that she had engaged in protected activity.

Similarly, Plaintiff cannot show pretext with regard to Defendant's reasons for causing her unescorted plant access to be placed on hold when she went on FMLA leave with a psychological diagnosis.  That denial of access was dictated by Southern Nuclear's FFD program.  Plaintiff has not even attempted to establish that Dr. Dodson (Southern Nuclear's medical director who is charged with reviewing medical information regarding FFO), or the outside medical personnel knew of her protected activity.  Similarly, she has not shown that these articulated reasons for these events were a pretext for retaliation.

### c.    Pretext Arguments Regarding Her Return to Work Claim

Plaintiff cannot proceed on her assertions related to the alleged "decision ... to terminate her at the end of March." (Doc. # 47 at 55).  As part of the PIP process, Plaintiff was given a deadline

of October 31, 2005 to improve her performance.  In light of her complaints about Brock, and the investigation that took place related to her complaints, the deadline for her to improve was extended until March 31, 2006.  After receipt of the complaints from Plant Hatch (which occurred while she was already on a PIP) requesting that Plaintiff not be returned to the plant, Burmeister wanted to terminate Plaintiff's employment immediately.  However, his recommendation was overruled and Plaintiff was not terminated.  Rather, she was allowed to continue her attempts to improve her performance during the period leading up to March 31, 2006.  Subsequently, Plaintiff went out on FMLA leave and, consequently, there was simply no decision reached about whether her employment should be terminated.  Thus, based upon this undisputed Rule 56 evidence, Plaintiff's retaliation claim necessarily fails on the issue of her alleged discharge.

Finally, Plaintiff identifies Defendant Southern Nuclear's failure to return her to work following her FMLA leave and continued denial of employment as another form of retaliation. As to Plaintiff's return from FMLA leave, Southern Nuclear points out that the reason Plaintiff was not immediately returned to work was that she had to undergo an FFD evaluation before her return. Before the process could be completed, Plaintiff was taken off work again and eventually placed on long-term disability leave.  Again, Plaintiff has neither argued nor attempted to show that these reasons are a pretext for retaliation.

### d.    Pretext Arguments Regarding Her Re-Hire Claim

Plaintiff's claim regarding Southern Nuclear's alleged retaliatory failure to re-hire her during the course of this litigation is subject to a somewhat different analysis than her other retaliation claims.  In *Jones v. Alabama Power Co.*, 2007 WL 3496720 (M.D. Ala. 2007), the court concluded that, in a retaliatory failure to hire case, to establish the second element of a traditional retaliation

prima facie case, *i.e.*, the "suffered an adverse employment action" element, a plaintiff must prove "that (1) he or she 'applied for a particular position (2) which was vacant and (3) for which [he or] she was qualified' and further that (4) he or she 'was not hired for that position.'" *Jones*, 2007 WL 3496720 at \*9 (citing *Velez v. Janssen Ortho, LLC*, 467 F.3d 802 (1st Cir. 2006)); *see also Duncan v. Washington Metropolitan Area Transit Authority,* 425 F.Supp. 2d 121, 129 (D. D.C. 2006) ("On a retaliatory failure to hire claim, the plaintiff's prima facie case encompasses the three elements of an ordinary retaliation claim, ... . The plaintiff must also establish two additional elements: (4) that he applied for the available job, and (5) that he was qualified for the position.").  Although Plaintiff has never been terminated, she does claim that since she has been removed from her position and in FFD limbo, she has sought other jobs at Southern Nuclear.  Accordingly, the court concludes that the *Jones* elements are useful here in determining whether Plaintiff can proceed under that particular theory.

Notably, Plaintiff's argument that the failure to re-hire her was retaliatory consists of nothing other than her assertion that she submitted numerous applications but has not been hired.  Plaintiff has failed to identify, with any specificity, the positions she claims she was denied in retaliation for her protected activity.  Moreover, the record contains virtually no evidence regarding the particulars of the positions for which she applied, other than Plaintiff's general assertion that they were engineer positions at various levels.  The record is further devoid of any information regarding how Plaintiff's qualifications and experience compare to the requirements of any particular position or stack up against the qualifications or experience of any particular applicant or incumbent.  Thus, Plaintiff has failed to even establish a prima facie case on this element of her retaliatory failure to re-hire claim.

When Plaintiff's claims in this case are properly analyzed and understood (and this applies to both her discrimination and retaliation claims alike), her basic contention is this: "I was not treated fairly." Was Plaintiff treated fairly and managed effectively? That is a question the court need not (and should not) answer because "Title VII does not require that the employer's decision be rational or that an employer hire or promote the most qualified applicant, nor does it even guarantee success for those having greater merit. Title VII only requires that the employer make such decisions without regard to race, sex, religion, color, or national origin [or protected conduct]." *Smith v. Alabama Dept. of Public Safety*, 64 F.Supp. 2d 1215, 1228 (M.D. Ala. 1999) (quoting *Harris v. Delchamps, Inc.*, 5 F.Supp. 2d 1316, 1321 (M.D. Ala. 1998) (citing *Gilchrist v. Bolger*, 733 F.2d 1551, 1553 (11th Cir. 1984))). "Employers have the freedom to make unwise, unsound, or even irrational decisions, and courts do not sit as super-personnel boards." *Tarrance v. Montgomery County Bd. of Educ.*, 157 F.Supp. 2d 1261, 1263 (M.D. Ala. 2001) (citing *Smith*, 64 F.Supp. 2d at 1228 and *Harris*, 5 F.Supp. 2d at 1321).

Because Plaintiff has failed to establish a prima facie case as to the alleged retaliatory decisions, and in any event has failed to rebut Defendant's legitimate, nondiscriminatory (or non-retaliatory) reasons for its actions, Southern Nuclear is entitled to summary judgment on Plaintiff's retaliation claim.

### E.    Count Five - Hostile Work Environment

#### 1.    General Principles

Both the Supreme Court and the Eleventh Circuit have made it clear that not all "harassment" is actionable under Title VII. *Meritor Sav. Bank FSB v. Vinson*, 477 U.S. 57, 67 (1986); *see also Oncale v. Sundowner Offshore Svcs., Inc.*, 523 U.S. 75, 81 (1998); *Gupta*, 212 F.3d at 583

(observing that fourth element is one that "tests the mettle of most sexual harassment claims").  Title VII is neither "a general civility code" nor "designed to purge the workplace of vulgarity."  *Oncale*, 523 U.S. 75, 81 (1998); *see also Blevins*, 52 F.Supp. 2d at 1350-51 (M.D. Ala. 1998).  A Title VII hostile work environment claim is established upon proof that "the workplace is permeated with 'discriminatory intimidation, ridicule, and insult ... that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'"  *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (quoting *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 65 (1986)).  "To establish a prima facie case of hostile work environment sexual harassment, [Plaintiff] must show: (1) that she belongs to a protected group; (2) that she has been subject to unwelcome sexual harassment; (3) that the harassment was based on her sex; (4) that the harassment 'was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment'; and (5) a basis for holding the employer liable."  *Watson v. Blue Circle, Inc.*, 324 F.3d 1252, 1257 (11th Cir. 2003) (quoting *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1245 (11th Cir. 1999)).  The fourth element of the prima facie case, severe and pervasive, "as defined by the Supreme Court, contains both an objective and a subjective component."  *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1276 (11th Cir. 2002) (citing *Harris*, 510 U.S. at 21-22)).

Plaintiff's argument relative to this claim relies almost exclusively on *Plaintiff's subjective reaction* to the alleged harassment to establish that her work environment was hostile and abusive.  She has failed to address either whether the conduct was directed at her "because of" her sex, or whether it was *objectively* hostile or abusive.  For the reasons stated below, the court finds that she has not established these two elements of her hostile environment claim.

46

### 2.       Plaintiff Has Not Established the "Because of" Sex Element

In the formal concern filed by Plaintiff, she described the alleged hostile environment as her being singled out and treated unfairly by Brock, that Brock acted inappropriately and made her feel uncomfortable, and that he had threatened her job and her pay.  She further complained that Brock excluded her from unofficial group activities such as lunch and social conversation.  As part of her concern, Plaintiff also complained that Brock made what she perceived as gender-biased and harassing comments, including:

1.      "You are not cut out to be an engineer; I think you'd make a natural teacher;"

2.      "You should look for another line of work;"

3.      "You remind me of my wife and I don't like her attitude either;"

4.      "What do you have to show for twenty-eight years with the company;"

5.      "I don't think we can turn this around;"

6.      "It doesn't matter, this won't change;"

7.      "The good news is we both get to keep our jobs.  The bad news is you are still not performing up to expectations;"

8.      "If I were you, I'd apply for another job;" and

9.      "Defending you is lowering my credibility with management."

(Doc. # 42, Pl. Exs. 14, 16).

Plaintiff also complained that Brock was impatient with her, slammed drawers, yelled, made degrading remarks in e-mails, displayed negative body language toward her, intimidated her, threatened her job, and told her he was not afraid to do what he felt was necessary.  Plaintiff also complained about the story Brock told her about a coach who punished a child by not playing him

after a father complained that his child was not playing enough.  Plaintiff further claims that Brock

deleted an e-mail from Plaintiff's computer which he had sent. (Doc. # 42, Pl. Exs. 14, 16).

    To prevail on her harassment claim, Ritchey must show that, "but for the fact of her sex, she

would not have been the object of the harassment."  *Blevins v. Heilig-Meyers Corp.*, 52 F.Supp. 2d

1337, 1344 (M.D. Ala. 1998) (citation omitted).  This she has failed to do.  Other than the fact that

Plaintiff is a woman and Brock is a man, there is virtually nothing about the alleged hostile

environment to suggest that it was "because of" her sex.  *See Hartsell v. Duplex Prods., Inc.*, 123

F.3d 766, 772 (4th Cir. 1997) ("An insulting or demeaning remark does not create a federal cause

of action for sexual harassment merely because the 'victim' of the remark happens to belong to a

class protected by Title VII.").  Even the one comment that references gender ("You remind me of

my wife and I don't like her attitude either") is not overtly gender-based in nature.  The only other

comment which could possibly include some reference to gender ("You are not cut out to be an

engineer; I think you'd make a natural teacher.") more precisely references a personality issue rather

than gender.[29]

    Plaintiff has simply not established that the alleged hostile environment was based upon her

gender.  Therefore, she has failed to establish the third element of her prima facie case.

### 3.    Plaintiff Has Not Established the Severe or Pervasive Element

    Even if the alleged conduct had been directed at Plaintiff "because of" her gender, it simply

does not rise to an actionable level.  Again, "Title VII is not meant to be a workplace 'civility code.'"

*Corbitt*, 589 F.3d at 1152 (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)).  The

---

    [29] Asking the court to infer that this comment is gender-based is essentially inviting the court
to engage in gender stereotyping itself, *i.e.*, by assuming that the reference to "teacher" is a reference
to a *female* teacher.

requirement that an environment be "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment ... filter[s] out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing."   *Corbitt*, 589 F.3d at 1152 (quoting *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1245 (11th Cir. 1999) and *Faragher*, 524 U.S. at 788, respectively)) (internal quotation marks and citations omitted).

While Defendant does not appear to dispute that Plaintiff *subjectively* perceived her work environment to be hostile and abusive, she must also establish that a reasonable person would find it hostile or abusive.  "To determine whether conduct is sufficiently severe or pervasive, we consider four factors: 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'"   *Corbitt*, 589 F.3d at 1152-53 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)); *see also Gupta*, 212 F.3d at 584.

Other than to point to her own subjective reaction to the alleged conduct, Plaintiff has failed to present any substantive argument on these issues.  As to the frequency of the conduct, Plaintiff does not allege that this conduct was a daily occurrence and admits that there were interim periods when Brock's approach to her was positive.  Considering that the alleged instances occurred over a period of almost two years (she was placed on a PIP in May 2004 and was taken off work in February 2006), they do not appear to have been particularly frequent.  Furthermore, upon examination of the comments and conduct, not only is there only a very tenuous connection to gender, but there is nothing that has been alleged that can be properly considered "severe."  None of it is alleged to be physically threatening.  Although Plaintiff complained that she felt that her *job*

was threatened, she cannot credibly assert that she feared for her physical safety. Finally, Plaintiff's assertion that her performance was wrongly evaluated as not meeting expectations, and that she was actually a strong performer, actually cuts against her argument that the alleged hostile environment unreasonably interfered with her performance. That is, she has consistently claimed that her performance was better than her evaluations and PIP reflect. Although Plaintiff was eventually taken off work for *medical* reasons, her position is that, at all times, her performance was at the very least adequate. Plaintiff has failed to establish that the environment she alleges she was subjected to was *objectively* severe or pervasive. Accordingly, she has failed to establish the fourth element of her prima facie claim.

Because Plaintiff has failed to establish two of the required elements of her prima facie case, Southern Nuclear is entitled to summary judgment on Count Five of her Complaint, her hostile environment claim.

### F.    Count Six - Negligent Hiring, Training, Supervision and Retention[30]

Ritchey next claims that Southern Nuclear is liable for negligent hiring, training, supervision, and retention of Brock. "The torts at issue have common elements. Namely, to prove a claim under Alabama law for either negligent/wanton entrustment, negligent hiring, negligent supervision or negligent retention, a plaintiff must demonstrate that the employer knew, or in the exercise of

---

[30] The court notes that, in her Opposition to Defendants Motion for Summary Judgment, Plaintiff has styled this section of her brief, " Plaintiff's Negligent and Wanton Hiring, Training, Supervision, and Retention Claim." Plaintiff's Complaint does not contain a wantonness claim, but rather merely states a "Negligent Hiring, Training, Supervision, and Retention Claim." (Doc. # 1, Count Six). To establish a wantonness claim requires more that a mere showing of a higher degree of culpability than negligence. Wantonness is characterized as a conscious act and requires a different and more stringent set of proof. *See, e.g., Ex parte Essary*, 992 So.2d 5, 9-10 (Ala. 2007).

ordinary care should have known, that its employee was incompetent." *Britt v. USA Truck, Inc.*, 2007 WL 4554027, *4 (M.D. Ala. 2007) (citing *Armstrong Bus. Servs. v. AmSouth Bank*, 817 So.2d 665, 682 (Ala. 2001) (negligent supervision); *Bruck v. Jim Walter Corp.*, 470 So.2d 1141, 1144 (Ala. 1985) (negligent/ wanton entrustment); *Brown v. Vanity Fair Mills, Inc.*, 277 So.2d 893, 895 (Ala. 1973) (negligent retention); *Sanders v. Shoe Show, Inc.*, 778 So.2d 820, 824 (Ala. Civ. App. 2000) (negligent hiring)).[31]   Therefore, for ease of reference, the court will refer to all of Plaintiff's negligence claims under the collective term negligent retention.

To succeed on her negligent retention claim, Plaintiff must establish two things: (1) that the underlying conduct of Brock was wrongful or tortious; and (2) that Defendant had actual or constructive knowledge of Brock's alleged incompetence.  *See Hester v. Brown*, 512 F.Supp. 2d 1228, 1238 (M.D. Ala. 2007).  "The 'incompetency' of the offending employee in a negligent training and supervision claim, ... , must be based on an injury resulting from a tort which is recognized under Alabama common law." *Sears v. PHP of Alabama, Inc.*, 2006 WL 932044, *19, n.13 (M.D. Ala. 2006) (citing *Stevenson v. Precision*, 762 So.2d 820, 824 (Ala.1999) (affirming summary judgment on negligent supervision/training claim for lack of underlying tort claim)).

Here, Plaintiff cannot produce the evidence necessary to maintain a negligent retention claim. First, Plaintiff simply has not established that Brock's conduct was either tortious or wrongful.  As discussed in more detail below, Plaintiff has produced insufficient evidence to establish an intentional infliction of emotional distress claim.  Thus, Plaintiff has not established either than

---

[31] The court considers these claims together because it "observes that there is no discernible distinction between claims of negligent supervision and claims of negligent training, ... ." *Sears v. PHP of Alabama, Inc.*, 2006 WL 932044, *19, n.13 (M.D. Ala. 2006) (citing *Zielke v. AmSouth Bank, N.A.*, 703 So.2d 354, 358 n. 1 (Ala. Civ. App. 1996)).

Brock committed, or that she was injured as a result of, an underlying tort recognized by Alabama law.  Furthermore, the court has already determined that Plaintiff has failed to establish her federal claims, including her claim of gender-based harassment.  However, even if that claim had been established, it could not form the basis for Plaintiff's negligence claims in light of the fact that "Alabama common law does not recognize a tort of sexual harassment in which employers would have a duty to protect their employees." *Sears v. PHP of Alabama, Inc.*, 2006 WL 932044, *20 (citing *Taylor v. Stevenson*, 820 So.2d 810, 811 (Ala. 2001)).[32]  Second, Plaintiff cannot produce sufficient evidence to demonstrate that Defendant either had knowledge of Brock's alleged wrongful conduct or failed to exercise due diligence to determine whether Brock acted wrongfully or tortiously.  Ritchey's Employee Concern, filed in August 2005, was the first formal complaint Southern Nuclear had ever received against Brock.  Once it received the complaint, Southern Nuclear conducted an investigation.  Although Southern Nuclear gave Ritchey the opportunity to provide feedback regarding the investigation (and even to question its findings) she failed to do so. Accordingly, a review of the Rule 56 file shows that Plaintiff cannot sustain her negligent retention claim.

For all these reasons, Southern Nuclear is entitled to summary judgment on Plaintiff's negligent hiring,[33] training, supervision and retention claim.

---

[32] The court notes that negligent supervision-type claims are recognized in cases even where summary judgment is granted on hostile environment sexual harassment claims.  However, this usually occurs where there are allegations of offensive touching, *i.e.*, allegations that may be sufficient to establish state law claims of assault and invasion of privacy.  No such allegations are made in this case.

[33] As to Plaintiff's negligent hiring claim, there is no evidence at all that Southern Nuclear hired Brock knowing that he had committed (or for that matter may in the future commit) a tort recognized under Alabama law.  All of the conduct about which Plaintiff complains, and which

### G.      Count Seven - Intentional Infliction of Emotional Distress

Plaintiff's intentional infliction of emotional distress claim is stated against both Southern Nuclear and Brock.  "The tort of outrage requires that: (1) the actor intended to inflict emotional distress, or knew or should have known that emotional distress was likely to result from his conduct; (2) the conduct was extreme and outrageous; (3) the defendant's actions caused the plaintiff distress; and (4) ... the distress was severe. With respect to the conduct element, this Court has stated that the conduct must be 'so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society.'" *Gunter v. Huddle*, 724 So.2d 544, 547 (Ala.Civ.App. 1998) (quoting *Harris v. McDavid*, 553 So.2d 567, 569-70 (Ala. 1989)); *see also American Road Serv. Co. v. Inmon*, 394 So.2d 361, 365 (Ala. 1980) (recognizing the tort of outrage as actionable in Alabama).

"The Alabama Supreme Court has clarified that 'outrage is a very limited cause of action that is available only in the most egregious circumstances.'" *Edwards v. Hyundai Motor Mfg. Alabama, LLC*, 603 F.Supp.2d 1336, 1354 (M.D. Ala. 2009) (quoting *Thomas v. BSE Indus. Contractors, Inc.*, 624 So.2d 1041, 1044 (Ala. 1993)).  The cause of action requires that both the conduct and the emotional distress be extreme.  "[T]his standard has been applied 'strictly' by the Alabama Supreme Court." *Edwards*, 603 F.Supp.2d at 1354 (quoting *Saville v. Houston County Healthcare Auth.*, 852 F.Supp. 1512, 1541 (M.D. Ala. 1994) (quoting *Continental Cas. Ins. Co. v. McDonald*, 567 So.2d 1208, 1211 (Ala. 1990))).  "So circumscribed, in fact, is the reach of the tort of outrage that the Alabama Supreme Court has allowed such claims only in three limited circumstances: 'cases having

---

Plaintiff asserts constitutes the tort of outrage, occurred after Brock was already working for Southern Nuclear.  Therefore, summary judgment on Plaintiff's negligent hiring claim is appropriate for this reason as well.

to do with wrongful conduct in the context of family burials; cases where insurance agents employed heavy-handed, barbaric means to coerce a settlement; and cases involving egregious sexual harassment.'" *Garrett v. Stanton*, 2008 WL 4701215, *8, n.17 (S.D. Ala. 2008) (quoting *Carter v. Harris*, 64 F.Supp.2d 1182, 1194 (M.D. Ala. 1999)).

Although Plaintiff may have presented evidence that her alleged emotional distress was extreme, she has not presented evidence of the type of extreme and outrageous conduct required to establish a cognizable outrage claim.  Plaintiff simply has not alleged the type of egregious harassment on which a cognizable outrage claim may rest under Alabama law.  The words of Judge Myron H. Thompson apply here: "While the defendants' behavior here may have been insensitive or made [Plaintiff] uncomfortable, she has presented no evidence suggesting that their conduct reached such an intolerable level." *Hendrix v. Chambers*, 2008 WL 509633, *5 (M.D. Ala. 2008) (citing *Am. Road Serv. Co. v. Inmon*, 394 So.2d 361, 364-65 (Ala.1980) (no outrage recovery for "mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities")).

Therefore, both Defendants are entitled to summary judgment on Plaintiff's outrage claim.

## IV.    Conclusion

For the reasons stated above, Defendants' motion for summary judgment (Doc. # 38) is due to be granted.  The court will enter a separate order granting the motion.

**DONE** and **ORDERED** this ____29th____ day of March, 2010.

**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE